Agnes Garry, Executrix, Appellee, v. Chicago City Railway Company, Appellant.

Gen. No. 14,997.

NEGLIGENCE—*what essential to recovery.* In order to recover for personal injuries alleged to have resulted because of the defendant's negligence, such negligence must be established by the plaintiff by a preponderance of the evidence.

Action in case for personal injuries. Appeal from the Superior Court of Cook county; the Hon. ROBERT W. WRIGHT, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1908. Reversed. Opinion filed June 3, 1910.

JOHN E. KEHOE and C. LEROY BROWN, for appellant.

HOLLETT, SAUTER & HENKEL, for appellee.

MR. PRESIDING JUSTICE CHYTRAUS delivered the opinion of the court.

This is an action on the case for a personal injury sustained by plaintiff, who fell off a street car going west on 61st street. Defendant is prosecuting this appeal to reverse the judgment rendered against it in a trial by jury.

A declaration of four counts was filed, but plaintiff discontinued as to the third and fourth counts. The cause of action stated in the first count is that plain-

tiff stepped upon the front platform of the car in question and became a passenger thereupon; that while he was in the exercise of all due care and caution for his own safety the car was "suddenly started and its speed and motion were suddenly and violently increased," whereby the "car was violently jerked" so that the plaintiff "was thereby jerked, jostled, overbalanced, knocked and thrown" from the car upon the ground in such manner that the car ran upon him and pushed and dragged him a considerable distance, by means whereof he was injured.

The cause of action stated in the second count is that plaintiff boarded and became a passenger on the car and that the appliances and mechanism of the car were carelessly and negligently handled, managed and operated and the electric power carelessly and negligently applied rapidly, unevenly and suddenly and in such excessive quantities as to cause the car to be violently jerked and its speed and motion to be violently and suddenly increased, so that plaintiff, while in the exercise of all due care and caution for his own safety, was thereby jerked, jostled, overbalanced, knocked and thrown off the car upon the ground and thereby injured.

The testimony of the plaintiff is not clear and is very difficult to understand. In order to comprehend the theory of plaintiff himself as to the precise manner in which he was injured, that we might be able to determine what was the operating, proximate cause, we have not only read the abstract but we have also carefully examined the record.

Plaintiff was in the defendant's employ driving a wrecking wagon but, when injured, he was not on duty. He had been having a vacation and it was his intention to return to his work the evening of the day he was injured. His hours of work were from six in the evening until seven in the morning.

As we understand plaintiff, his direct testimony is that he was forty-nine years of age; that on the morn-

ing of December 3, 1906, having been out to purchase meat, at about 8 o'clock in the morning, he was at the northwest corner of Morgan and 69th streets on his way to his home at 6809 Throop street; that he desired to take a west-bound car on 69th street and signalled the second car that came; that the car stopped and he stepped on at the front end; that he had purchased two packages of meat which he carried under his left arm; that before he stepped on, a man stepped off the car at the front end; that just as he was getting on and had one foot on the step and the other on the platform, the bell rang for the car to go ahead and it went ahead; that he had a hold of the grab-handle, on the front of the vestibule of the car, with his right hand; that, "when I was getting right up on there, there was a man standing somewhere in the door, or around the door, I don't know where;" that the motorman threw the controller handle around and put the power on which "jerked" the man standing so "he caught me some way and that overbalanced me and made me swing out;" that he was not still trying to get on, but was then on, that the jerk of the car threw the man standing up against him and forced him out while he was holding the grab-handle with his right hand; that he then swung around with his foot upon the eyering on the front corner of the car, to which the brake chain is hooked; that then "my arm here was swinging against the edge of the dash-board of the car, and I could not hold on, and I told" the motorman to stop; that he had to let go and fell with his head first below the step or corner of the car and was caught in there and became unconscious; that from the time the car started when this man "bumped" against him the car ran 225 feet to a feed store, west of the alley, before he dropped; that the car ran 30 or 40 feet, after the jerk; that it ran 30 feet after he called out to the motorman to stop; that his best recollection is that the car ran 20 feet after he fell under it; that he first recovered consciousness about noon, when he was in the

hospital; that he knew the motorman whose name was Frank Hake, whom he called Hank; and that during the morning before he was injured he had had nothing to drink and had not been in any saloon.

Upon cross-examination he testified: That the distance from Throop street to Morgan street is about a quarter of a mile; that when he left home he walked east on the north side of 69th street and in going east stopped in no place other than the butcher-shop; that after he had obtained his meat he saw the keeper of the saloon, whom he knew, at the northwest corner of Morgan and 69th streets, standing in the saloon door; that he went into the saloon and had one drink "a little whiskey—a little bit of whiskey;" that he stopped in no other saloon that morning; that he had just put his second foot up on the platform when he was pushed—"I had hold of the grab-handle and was just putting it up;" that he did not then have both feet on the platform; that his right foot was on the step and he was just about to put the other up when "this jerk" overbalanced him; that there was another person standing up against the body of the car south of the door in "south corner" of the platform; that he had no difficulty in getting up the step and upon the platform of the car; that the jerk occurred just as the car started; that he was standing "right by the side" of the motorman when he turned on his lever; that there were three men on the platform, including the motorman and excluding himself, when he got on; that the car started enough "to throw this gentleman up against me to swing me around;" that he then held on with his right hand and held the meat under his left arm; that the eye-ring upon which he had his foot was on the corner of the bumper of the car, straight down from the hand-hold on a level with the top of the step.

Two other witnesses testified for the plaintiff as to the occurrence. One, Mr. Napheys, testified that he sat on the north side of the car inside; that two ladies

sat opposite him; that according to his recollection there was only one man besides the motorman on the front platform when plaintiff came on the car and that man stood to the left, on the other side of the door from plaintiff; that the first thing that attracted his attention to the accident was the agitation of the two ladies. On cross-examination this witness testified that he remembered the stopping of the car at Morgan street and plaintiff's getting upon the car; that he saw plaintiff standing on the front platform and that he stood to the right of the motorman; that the car started in the usual way and, according to his recollection, there was no jerking or surging of the car and that he did not see how plaintiff fell off. The other witness to the occurrence on behalf of plaintiff saw very little of it and testified to nothing material.

On behalf of defendant the conductor on the car in question was called. He testified that he knew Garry, the plaintiff; that, without then knowing who it was, he first saw plaintiff, through the window of the car, getting up on the front platform; that he "gave the bell" and the car started easily as usual without any jerking or jarring; that, with reference to Garry's falling, he noticed when Garry got on the car and he appeared to speak to the motorman and while doing so "he [Garry] went to step back, as though he was going to put his back up against the car * * * . Just as he did that, why off he went—off that quick (indicating) * * * . It was all done right quick." The motorman testified that as the car came to Morgan street he "received no bell" to stop the car and no one got off the car but he saw Garry, whom he knew, standing there and stopped the car with the rear platform as near the cross-walk as possible; that in getting on the car "he came up to the car, and he had some packages in his left hand, and he took hold with his right hand, and when he lifted his foot he kind of staggered back and his hand let go again. I was standing there wait-

ing for him to get on. Then he took hold again. That time he got on up onto the car—up onto the platform;'' that ''He says, 'Hello Hank,' he called me Hank instead of Hake, I said, 'Hello Garry,' and he says, 'The car ahead didn't stop.' I said, 'I noticed it didn't;' '' that ''then he went to step in against the end of the car, apparently, and he stepped off the step and down he went right down on the ground—the side of the step;'' that ''when the car started Garry was up on the platform by my side and he had both feet on the platform;'' that the car started up in the usual way, easily, without any jerk, or jarring or surging of the car and there was no jerk, jar or surging of the car up to the time he fell; that up to the time he stepped back, during that conversation, the car had travelled about eighty or a hundred feet; that when he fell Garry kept hold of the handle bar and ''went down kind of along the edge of the step;'' that the car was stopped in a distance of twenty-five feet from the point where he made the misstep and when the car had stopped Garry was at the first journal-box from the front.

A witness, called on behalf of defendant, testified, in contradiction of Garry, that he was with Garry the morning the latter was injured and that the latter was in two saloons, while witness was with him and before he obtained the meat, and drank two ''schnit'' of beer. There is, also, a conflict of evidence as to whether Garry was under the influence of liquor.

That Garry was ''bumped'' against, ''overbalanced'' or jostled by any person so as to occasion his falling is inconsistent with the testimony of every witness who testified on the subject, other than himself, and his testimony in that respect must be regarded as wholly disproved. In many respects his testimony, as to what occurred in connection with the fall, is clearly disproved by a clear preponderance of the evidence.

We think the plaintiff totally failed to establish by a preponderance of the evidence his case as presented

in either the first or the second count and as testified to by him. No negligence on the part of the defendant appears to have been proven. The judgment must be reversed and the case will not be remanded.

*Reversed.*